DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

SAILAJA M. PAIDIPATY (NY5160007)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, CA 94102-3495
    Telephone: 415-436-7200
    Fax: 415-436-7234
    sailaja.paidipaty@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 20-0480-2 WHA |
| Plaintiff, | 20-0480-3 WHA |
| v. | MEMORANDUM IN SUPPORT OF GOVERNMENT'S MOTION TO DETAIN DEFENDANTS PENDING TRIAL |
| LEYDIS YANETH CRUZ, and PAMELA CARRERO | Hearing date: December 17, 2020, at 10:30 am |
| Defendant. | |

## I. INTRODUCTION

Leydis Yaneth Cruz ran a drug trafficking organization that flooded the streets of this District with significant quantities of fentanyl. As detailed in the criminal Complaint, along with her son (and co-defendant), Emilson Cruz Mayorquin, and her daughter (and co-defendant), Pamela Carrero, Leydis[1] sold significant quantities of powder fentanyl and counterfeit pharmaceutical pills laced with fentanyl to other drug re-sellers. On a near daily basis, Carrero, a leading foot soldier of the organization, sold that

---

[1] Because numerous defendants in the case share the same last name, the government references Defendant Leydis Yaneth Cruz by her first name throughout this memorandum.

fentanyl to users and drug dealers on the streets of the Tenderloin.  Not only did Leydis and Carrero expose the community to this dangerous drug, but they endangered their own young children by storing fentanyl in the apartment that they shared.  When agents executed a search warrant at the defendants' apartment last Thursday, December 10, they found approximately 1.4 gross kilograms of suspected fentanyl within the residence.[2]  Some of the suspected fentanyl was hidden in the broiler of the family's oven – easily within grabbing distance of Leydis's five year old daughter, and Carrero's two year old son.

      Both defendants have a long history of failing to abide by mandated conditions.  In 2018, Carrero entered the United States illegally, was apprehended by U.S. Border Patrol and then released into Leydis's custody on the condition that she would appear for further immigration hearings.  Carrero failed to appear as required and the following year an immigration judge ordered her removed in absentia.  It was not the first time that Leydis had promised immigration officials that her children would appear for a hearing only to never be heard from again.  In 2012 and again in 2014, Leydis took custody of Emilson after he was arrested by immigration officials.  Each time, neither Leydis nor Emilson appeared for another hearing.

      Carrero similarly has failed repeatedly to abide by court-ordered conditions.  Following arrests for drug dealing in the Tenderloin in August 2019 and March 2020, Carrero was ordered to stay away from the area.  But Carrero continued to sell drugs in the Tenderloin until the time of her arrest, including to an undercover federal agent who bought fentanyl from Carrero in the Tenderloin this past July.

      Further, Leydis and Carrero have no misgivings about helping others evade authorities.  In August 2020, the defendants discussed lying to a representative of a local sheriff's office with respect to the whereabouts of a family member who was subject to court supervision.

      Finally, Leydis and Carerro have extensive ties to Honduras where their other family members reside.  During one intercepted conversation with a family member in Honduras, Leydis lamented the

---

[2] The drug weight reported reflects a gross weight calculation inclusive of packaging.  The drugs have been sent to the DEA Western Laboratory for further chemical analysis.

MEMO. I/S/O GOVT'S MOT. TO DETAIN    2
20-0480-2 WHA
20-0480-3 WHA

amount of money that Emilson was spending on a home being built there. The family member joked that with the amount of construction being done, the resulting residence would not be a "house," but rather would be a "mansion." Just this year, Leydis's significant other represented to this Court that the family wanted to move back to Honduras. Leydis's boyfriend, Jairo Rodriguez-Martinez, who pled guilty to drug trafficking charges before the Honorable Haywood S. Gilliam, Jr., indicated at sentencing that the couple and their young child intended to return to Honduras following completion of his sentence.

The law presumes that no condition or combination of conditions can reasonably assure Leydis or Carerro's appearances as required or the safety of the community. Their conduct shows that the presumption is warranted. The government agrees with Pretrial Services that the Court should detain both defendants pending trial.

## II.   LEGAL STANDARD

To detain a defendant pending trial, the Court must find by a preponderance of the evidence that there are no conditions that will reasonably assure the defendant's appearance as required, or find by clear and convincing evidence that there are no conditions which reasonably will assure the safety of any person or the community. 18 U.S.C. § 3142(f).

In cases such as this, where there is probable cause to believe that the Defendant violated the Controlled Substances Act and faces a maximum of 10 years or more in prison, there is a rebuttable presumption that no condition or combination of conditions reasonably will assure the defendant's appearance as required and the safety of the community. *Id.* § 3142(e)(3)(A). The burden of production then shifts to the defendant. *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008) (citing *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986)). Although the presumption is rebuttable, it is not a "bursting bubble." *United States v. Jessup*, 757 F.2d 378, 382-83 (1st Cir. 1985) (Breyer, J.). In other words, the presumption is not so weak that whenever the defendant introduces evidence, "the presumption 'bursts' and totally disappears, allowing the judge (or jury) to decide the question without reference to the presumption." *Id.* Since a defendant can "always provide the magistrate with *some* reason … a 'bursting bubble' approach might render the presumption virtually meaningless, contrary to

Congress's clear intent." *Id.* (emphasis added).

If the Court finds that the defendant has rebutted the statutory presumption of detention, the Court considers four factors in determining whether the pretrial detention standard is met: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence; (3) the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse, and criminal history, as well as whether the crime was committed while the defendant was on probation or parole; and (4) the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release.  18 U.S.C. § 3142(g).

Here, neither Leydis nor Carrero can overcome the presumption in favor of detention.  Their failures to previously honor conditions of release and their extensive international ties establish that no conditions of release can mitigate their risk of flight.  Moreover, the nature and circumstances of the current offense, specifically the volume of fentanyl involved in the crime, show that the defendants pose a considerable danger to the community.

### III. ARGUMENT

#### A. Leydis and Carrero's repeated violations of prior conditions and willingness to mislead authorities demonstrate that they cannot be trusted to appear as required.

Leydis and Carrero's arrests in the current case are far from their first run-ins with law enforcement.  Every time the defendants promise to appear for further hearings, they abscond and are only heard from when arrested again on other conduct.  In 2005, Leydis was deported after being apprehended by U.S. Border Patrol in Texas.  At some point afterwards she re-entered the country.  Since then, she has served as a custodian on immigration bonds for both of her children, yet failed to appear for any hearings.  For example, in August 2012, immigration officials released Emilson into Leydis's custody on the condition that he would appear for a hearing.  Emilson never appeared.  The same thing happened again in February 2014 following Emilson's arrest on unrelated conduct.  In 2018, Leydis bailed Carrero out of immigration custody, promising to make future appearances at hearings.  True to form, no future hearings were attended.

In addition to defying immigration officials, Carrero flouts mandates of local courts.  In August

2019, officers of the San Francisco Police Department (SFPD) arrested Carrero after seeing her conduct hand-to-hand drug sales in the Tenderloin neighborhood of San Francisco. A few months later, in March 2020, Carrero was arrested again, along with another individual, for narcotics sales in a different part of the Tenderloin. The San Francisco District Attorney's Office filed charges following both arrests, which appear to still be pending. As a condition of release, Carrero was ordered to stay away from the areas of the Tenderloin where she was arrested. Carrero remained undeterred. As described in the criminal Complaint, on July 2, 2020, an undercover federal agent purchased fentanyl from Carrero on Hyde Street in the Tenderloin. Dkt. 1, Compl. ¶¶ 57-67. SFPD officers report seeing Carrero in the area on a near daily basis. Unbeknownst to the federal government, the San Francisco City Attorney's Office also noticed Carrero's repeated conduct. In September 2020, the City Attorney's Office sued Carrero to enjoin her from entering the Tenderloin as prior court stay away orders went unheeded. *See People v. Carrero*, CGC-20-586736 (Sup. Ct., S.F. County). Undersigned counsel recently reviewed the docket in that case. According to court filings, Carrero was personally served with the lawsuit on October 9, 2020 while standing on the sidewalk of Hyde Street between Golden Gate and Turk – in the middle of the very area from which she previously was court-ordered to stay away. *See People v. Carrero*, GCG-20-586736, Proof of Service of Summons (filed Nov. 4, 2020).

Finally, intercepted calls show that Leydis and Carrero are willing to lie for others to assist them in evading authorities. As noted in the Complaint, the Honorable Jon S. Tigar, U.S. District Judge, authorized the interception of wire communications over phones used by Leydis and Carrero. On August 24, 2020, Carrero received a call from a sheriff's office that was inquiring about an individual named Jason Mayorquin. Carrero indicated that Jason was her cousin. The representative from the sheriff's office said they needed to get in contact with Jason. Carrero stated that she did not have his new telephone number but could try to contact him on Facebook. The sheriff's office representative asked Carrero to report back if she was able to find a contact phone number. A few hours later, at approximately 5:08 p.m., Leydis called Carrero to discuss Jason. A transcript of that call follows:[3]

---

[3] The original call was conducted in the Spanish language. Spanish linguists prepared the transcript referenced here, which was provided by the government to defense counsel for both Leydis and Carrero.

MEMO. I/S/O GOVT'S MOT. TO DETAIN            5
20-0480-2 WHA
20-0480-3 WHA

| | | |
|---|---|---|
| 1 | CARRERO | [Aside: Yes, I'm going to (U/I)[4]] Mommy. |
| 2 | LEYDIS | Nicole,[5] I forgot to tell you, Jason [U/I] ankle bracelet, did |
| 3 | | he mention it to you? |
| 4 | CARRERO | Yes, he just told me. |
| 5 | LEYDIS | Oh yeah, and right now that I just got out of the bathroom, I |
| 6 | | was going to tell you. He told me if I asked you. You only |
| 7 | | know… |
| 8 | | [Voices Overlap] |
| 9 | CARRERO | He told me, [Audio Glitch] [U/I] but it is a long time. |
| 10 | | [Audio Glitches] He said. Just a long time. [Pause] |
| 11 | LEYDIS | All right, [U/I] [Audio Glitches]. |
| 12 | CARRERO | Huh? |
| 13 | LEYDIS | Whenever they call you again, just tell them, you know |
| 14 | | nothing about him. |
| 15 | CARRERO | [U/I] [Audio Glitches]. |
| 16 | LEYDIS | Yes, it won't benefit you for you to continue answering. |
| 17 | CARRERO | Yeah. |

Based on the context of the call, it appears that Carrero's cousin was subject to some degree of court supervision based on the reference to an ankle monitor. Agents do not have additional information regarding the cousin's criminal history or status on supervision. What is clear, however, is that during the conversation, Leydis coached Carrero to lie if the authorities ever called her again. Leydis cautioned, "Whenever they call again, just tell them, you know nothing about him." Leydis clearly knew this was a lie and that Carrero in fact was in contact with Jason as she asked whether Jason had mentioned the "ankle bracelet." Carrero agreed to her mother's plan at the end of the call. In light of

---

[4] The notation U/I indicates that a certain portion of the intercepted conversation was unintelligible to monitors.

[5] Nicole is one of Carrero's aliases. According to some criminal history records, it may be Carrero's middle name.

this brazen agreement to lie and presumably assist a family member evade law enforcement, this Court has no reassurance that Leydis or Carrero will abide by any conditions imposed on them.

**B.     Both Leydis and Carrero's international ties render them a significant flight risk.**

As noted in the Complaint, several of the co-defendants in the case are related.  While these family members live in the Bay Area, much of Leydis and Carrero's extended family lives in Honduras as described in the Pretrial Services Reports.  Intercepted communications as well as prior representations to this Court indicate that the family has every intention of going back to Honduras, presumably after making enough money locally on the drug trade.  During an intercepted phone call on August 26, 2020, Leydis spoke with a family member abroad about a house that Emilson is constructing in Honduras.  An excerpt of the conversation follows:[6]

| | |
|---|---|
| LEYDIS | Emilson is also stressed here with work so then he gets stressed with…[audio glitch]… he stresses her, and they are just like that, just problems, so then… mainly where it could me more relaxed is in Honduras. Life here is a little stressed because… thing is that Emilson has a lot of customers and one calls him, another one calls him, how can there be no stress. |
| RELATIVE | Yes, because there are times when he's talking with… [Aside: wait mami, we can talk later]…Look, he's removing the ceramic from the house, he's going to put porcelain. [U/I] how can I say no to him. |
| LEYDIS | [U/I] |
| RELATIVE | Let's give him the satisfaction. That house is not going to look like a house, it's going to look like a mansion. With everything that he's asking. |

---

[6] The original call was conducted in the Spanish language.  Spanish linguists prepared the transcript referenced here, which was provided by the government to defense counsel for both Leydis and Carrero.

MEMO. I/S/O GOVT'S MOT. TO DETAIN                    7
20-0480-2 WHA
20-0480-3 WHA

| | | |
|---|---|---|
| 1 | LEYDIS | My God, thing is that Emilson doesn't stop spending, right? |
| 2 | | |
| 3 | | […] |
| 4 | RELATIVE | I told everyone, [U/I] a garage in his house. He said, here in |
| 5 | | the name of [U/I]. This guy wants to leave it like a, like |
| 6 | | what can I tell you… Look, with everything that that man |
| 7 | | has asked for [U/I] that house is not going to look like a |
| 8 | | house. |
| 9 | LEYDIS | God permit. |
| 10 | RELATIVE | A mansion. |
| 11 | LEYDIS | So then it's a mansion and a half, what he's making [U/I]. |
| 12 | RELATIVE | You could see what, how it will be, because everything |
| 13 | | white. White on top and white on the bottom. He's going to |
| 14 | | throw out all the wood. |
| 15 | LEYDIS | Emilson [U/I]. Just anyone is going to go live there and |
| 16 | | they will use it first. |

Based on the context of the call, Leydis and the family member appear to be discussing a house under construction that Emilson is funding. Leydis decried the amount of money that Emilson is spending. The family members responds that with the amount of things Emilson wants to get done, the final product won't be a "house," but will be a "mansion." Additionally, intercepted calls indicate that members of the family wire money to Honduras. If released, Leydis and Carrero have a home abroad and every incentive to return there as opposed to abiding by a bond in this case.

Further, Leydis's significant other, Jairo Rodriguez-Martinez, who was charged with drug trafficking offenses in December 2019 informed the Court during his sentencing that his family, including Leydis, and their young daughter, anticipated returning to Honduras. *See* No Cr 19-0707 HSG. In urging the Court to impose a time served sentence, Rodriguez-Martinez noted that the family intended to leave the county. Taken together, the Cruz family appears to be planning to return to

MEMO. I/S/O GOVT'S MOT. TO DETAIN        8
20-0480-2 WHA
20-0480-3 WHA

Honduras and is already making arrangements for their lives there. No combination of conditions can mitigate the risk of flight posed by both defendants.

### C. The quantities of fentanyl involved in this case endangered the community at large and the defendants' immediate families.

In addition to risk of flight, both Leydis and Carrero pose a significant danger to the community. As described in the Complaint, this case primarily involves the sale of fentanyl. The Cruz organization's drug dealing was all encompassing – from selling to individual drug users on the street, to selling larger resale quantities, including several ounces of fentanyl at a time, to resellers. As mentioned above, an undercover agent bought fentanyl from Carrero on the street in the Tenderloin. Intercepted calls and physical location data associated with Carrero's cell phone indicate that she is in the Tenderloin on a near daily basis selling drugs on the street. Over the course of several months, the undercover agent purchased larger quantities of fentanyl from Carrero and Leydis. On one occasion, the undercover bought four ounces of fentanyl (over 100 grams) from the defendants. (*See* Dkt. 1, Compl. ¶¶ 69-76.) Leydis and Carrero also sold counterfeit pharmaceutical pills, commonly referred to as "M-30"s. Typically, M-30 references the markings on tablets of oxycodone. Over the past year, law enforcement has seen an increase in the circulation of counterfeit M-30 pills that contain fentanyl. In this case, Leydis and Carrero sold thousands of pills to the undercover agent. Laboratory testing confirmed the presence of fentanyl and acetaminophen (the generic ingredient in the drug known by the brand name Tylenol). *See* Dkt. 1, Compl. ¶¶ 77-81, 91-107. This is no mere small-time drug operation. This quantity of fentanyl is considerable. As noted in the Complaint, according to the DEA, two milligrams of fentanyl can be fatal. Dkt. 1, Compl. ¶ 17.

One of the most concerning aspects of this case is that fentanyl was seized from Leydis and Carrero's apartment where Leydis's five year old daughter and Carrero's two year old son both live. Agents seized approximately 1.4 gross kilograms of suspected fentanyl, 153 gross kilograms of suspected cocaine, and 276.5 grams of suspected methamphetamine from the residence.[7] The majority

---

[7] All of these measurements reflect gross weights that are inclusive of packaging. The drugs have been sent to the DEA Western Laboratory for further chemical analysis.

MEMO. I/S/O GOVT'S MOT. TO DETAIN                9
20-0480-2 WHA
20-0480-3 WHA

of these drugs were stored in the broiler below the oven, within easy reach of either of the children. The rest of the drugs were located in an under sink drawer in a bathroom. Those, too, were within reach of the kids. Undersigned counsel understands that because of the volume of drugs and the age of the children, agents were required to call local child protective services. The children currently remain in the custody of Alameda County Child Protective Services pending an investigation and custody hearing.

The dangers of fentanyl cannot be stressed enough. If released, Leydis and Carrero would have access to their drug sources to acquire more drugs for sale. Selling more drugs would mean the defendants could easily and quickly acquire cash to flee the country. The Complaint quotes calls during which Leydis and her brother, co-defendant Ivan Mauro Cruz Mayorquin, discuss the high demand for fentanyl and how quickly they can sell it. *See* Dkt. 1, Compl. ¶¶ 24-25. No combination of conditions of release can mitigate this ongoing danger.

## IV.    CONCLUSION

Leydis and Carrero cannot rebut the presumption of risk of flight and danger to the community. Even if the Court finds that they have successfully rebutted that presumption, the government has shown by a preponderance of the evidence that no condition or combination of conditions would reasonably assure their appearance for future court proceedings. Both have failed to respect prior court directives and have no apprehension about lying to law enforcement. Much of their family remains in Honduras where their co-defendant, Emilson, appears to be building a home. And finally, prior deportations, arrests, and the simply knowledge of the danger of fentanyl, have not dissuaded Leydis and Carrero from selling the drug or storing it in their home. The danger to the community cannot be mitigated.

//
//
//
//
//
//
//

MEMO. I/S/O GOVT'S MOT. TO DETAIN         10
20-0480-2 WHA
20-0480-3 WHA

1 | Accordingly, the government joins Pretrial Services in requesting that the Court detain Leydis and
2 | Carrero pending trial.

3 | DATED: December 17, 2020                              Respectfully submitted,

4 |                                                                             DAVID L. ANDERSON
5 |                                                                             United States Attorney

6 |                                                                             _____/s_____
7 |                                                                             SAILAJA M. PAIDIPATY
                                                                                Assistant United States Attorney