KENNETH H. WINE(#142385)
Hallinan & Wine
345 Franklin Street
San Francisco, CA  94102
Telephone:  (415) 621-2400
Facsimile: (415) 575-9930
email: kenwine@hotmail.com

Counsel for PAMELA CARRERO

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ) | CR-20-480 WHA |
|---|---|---|
| Plaintiff, | ) | |
| | ) | SENTENCING MEMORANDUM |
| | ) | OF DEFENDANT |
| v. | ) | PAMELA CARRERO |
| | ) | |
| PAMELA CARRERO, | ) | Date: January 11, 2022 |
| | ) | Time: 2:00 p.m. |
| Defendant. | ) | |
| | ) | HON. WILLIAM H. ALSUP |

**I.     Introduction**

On September 7, 2021, Defendant Pamela Carrero-Cruz[1] plead guilty to Count Five of the Indictment, distribution of more than 50 grams of a mixture containing a detectable amount of fentanyl, 21 U.S.C. §§ (a)(1), (b)(1)(B).  Although the charge is subject to a 60 month mandatory minimum, Ms. Carrero fits the criteria for Safety Valve under U.S.S.G. § 5C1.2.  Her agreed guideline calculations are Base Level Offense of 26, a 2 point reduction for Safety Valve, and a 3 level reduction for acceptance of responsibility, for an Adjusted Offense Level of 21.[2]

---

[1].   Because her family are co-defendants, Ms. Carrero-Cruz will be referred to as Ms. Carrero or Pamela to avoid confusion.

[2].   The plea agreement contains an error in the calculation of the Base Offense Level, which should be 26, not 28.  The error was caught by the Probation Officer. The plea agreement also contains another 2 level departure for a Global Disposition. *See, Plea Agreement of Pamela Carrero,* Dkt. 96, ¶8. At this time, the remaining defendant involved in the Global Resolution, Ana Maldonado, has not accepted the plea and has gone on the lam.  Therefore, the final Adjusted Offense Level is 21.

This is Ms. Carrero's first offense, therefore, her criminal history points are zero and her CHC is 1, with a final guideline range of 37-46 months. After analyzing the 18 U.S.C. §3553(a) factors, the probation officer recommends a downward variance to *time served* due to Ms. Carrero's youth (21 years old), history of sexual and physical abuse, and significant collateral consequences, including the expected loss of her parental rights to her 3 year old infant son, and deportation and banishment from the United States for life.

**II.    Factual Background**

Pamela Carrero is a 21 year old defendant facing her first incarceration. She has been in custody for over a year since her arrest on December 20, 2020. Her co-defendants are her family, to wit: – (1) her mother, Leydis Cruz, (2) her older brother, Emilson Mayorquin, (3) her uncle Ivan Mayorquin, (4) Emilson's girlfriend, Ana Maldonado, and (5) family friend, Adonis Torres. The family is from Honduras, and has endured soul crushing poverty and all its intendant ills throughout their lives. They came to America to make a better life for themselves. Unfortunately, after Pamela gave birth to her son, her mother's drug dealing boyfriend pressured Pamela to contribute to the household expenses by working the streets, selling drugs in the Tenderloin. Her older brother Emilson, and her mother Leydis, approved of and supported Pamela's daily life as a low level street dealer.

The PSR lays out the offense conduct in detail at ¶¶ 8-20, and those details will not be repeated here. Essentially, Pamela Carrero was one of the street level dealers for the family business. How she got to be a street level drug dealer is easy enough to understand. Why she did is another matter entirely.

**A.    Early life**

Born into poverty in Honduras, Pamela suffered all the trauma one might expect living in a dangerous, chaotic country, without a reliable government or police force, in an area controlled by violent drug gangs. In addition to the generalized trauma of growing up in that environment, Pamela suffered abuse, both physical and sexual, that could be fairly characterized as extreme.

At age 5, Pamela was taken by her father who she had never met, and placed in the care of his wife, Pamela's step-mother, who refused to feed Pamela and abused her physically. For example, her step-mother took Pamela to the public park and locked her in a portable toilet for several hours. Needless to say, Pamela was traumatized by this event and remembers it vividly today. She was subsequently discovered by a family friend, and returned to her father's home. After a brief, if terrifying, stay with her father, Pamela's mother Leydis came and took Pamela back to her house.

Shortly thereafter Leydis, a single parent, left for the United States and placed Pamela in the care of her grandmother, who was a loving, though overwhelmed, provider for several grandchildren. During the decade spent at her grandmother's house, Pamela was sexually molested by her brother and uncle. The details are set forth in the PSR ¶48-49. She was physically abused by her aunt on a regular basis. When Pamela was 10, a teacher noticed the bruises on her back and legs, became concerned and threatened to report the aunt to the police. At that point, the physical abuse from her aunt stopped.

At the age of 17, Pamela fled from Honduras to be with her mother in the States. She had a baby at 18 while she was traveling to live with her mother in Oakland. It was shortly after she had her baby that she was pressured to get to work on the streets by her mother's boyfriend. That Pamela did so under pressure, and with the approval of her family, is no excuse. It was a foolish decision with perhaps the most severe collateral consequences conceivable.

At the time of her arrest, Alameda County took possession of Ms. Carrero's 2 year old son, Steven Santos. He has remained in the custody of foster care for the past year. Hearings are currently set in that case in February 2022 to determine the course of Ms. Carrero's custody status. In the event the Court sentences Ms. Carrero to a term of imprisonment, she will likely lose custody of her son, forever. Few cases carry collateral consequences as terrible, or permanent, as a mother's loss of custody of her child, especially an infant.

### III.    Legal Argument

With the advent of *U.S. v. Booker*, 125 U.S. 738 (2005), the Court was finally restored with the power to sentence as it sees fit within the statutory framework of 18 U.S.C. § 3553(a). The

restoration of this power gives the Court real discretion to fashion a sentence *"sufficient but not greater than necessary"* to achieve the purpose of sentencing set forth in 18 U.S.C.§3553(a)(2) after considering:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant [§3553(a)(1)];

(2) the need to reflect the seriousness of the offense, respect for the law, deterrence to criminal conduct, and protection of the public [§3553(a)(2)(A)-(C)]

(3) the kinds of sentences available [§3553(a)(3)];

(4) the advisory – but *non-mandatory* – Sentencing Guidelines [§3553(a)(4) and (a)(5)];

(5) the need to avoid unwarranted sentencing disparity among defendants with similar records and similar conduct [§3553(a)(6)]; and

(6) the need to provide restitution to any victim of the offense [§3553(a)(7)].

In this case, the Court must choose the minimally sufficient sentence to fulfill the purposes of sentencing based on a consideration of all §3553(a) factors. *Kimbrough v. U.S.*, 128 S.Ct. 558, 570 (2007). The Supreme Court has also rejected the notion that a sentence that amounts to a substantial variance from the Guidelines needs to be justified by extraordinary circumstances, holding instead that appellate courts must review all sentences, both within and without the Guidelines range, under a differential abuse of discretion standard. *Gall v. United States*, 552 U.S. 38, 128 S.Ct. 586, 591 (2007).

Two subsequent Supreme Court decisions, *Spears v. United States*, 555 U.S. 261(2009) and *Nelson v. United States*, 555 U.S. 350 (2009), have reiterated that the Guidelines are now truly advisory and that there is no presumption at the district court level that a Guidelines sentence is inherently reasonable. As stated by the Seventh Circuit, "[t]he district courts must calculate the advisory sentencing guideline range accurately, so that they can derive whatever insight the guidelines have to offer, but ultimately they must sentence based on 18 U.S.C. § 3553(a) without any thumb on the scale favoring a guideline sentence." *United States v. Sachsenmaier*, 49l F.3d 680, 685 (7th Cir.2007).

Here, there are some unique characteristics to Pamela that deserve consideration by the Court. Pamela is not a sophisticated or experienced drug dealer (although she did deal drugs) or even

4

a competent drug delivery person.  Her level of naivete speaks through her actions. She worked on a street corner in the Tenderloin selling small bags of drugs, including fentanyl.  On a good day, she might make a hundred dollars.  On a bad day, maybe twenty.  She had prior arrests in San Francisco, but every time she was arrested she was immediately released, and told not to worry about it by her public defender.  After her first arrest, she was immediately released and sent to Community Drug Court.  The same occurred after her second arrest.  Her experience taught her (and she honestly, even fairly, believed) that she could not get in real trouble for dealing drugs in San Francisco. How terribly wrong she was.

Moreover, Pamela is also a young woman, just 20 years old when she committed this crime.  Although technically an adult, given her troubled childhood, and the constant struggle to survive it, Pamela surely has the same lack of maturity found in younger women. She undoubtedly suffers from PTSD from her childhood filled with poverty, physical violence, and sexual abuse at a very young age. While the sentencing guidelines briefly contemplate that youth may be relevant in determining whether a departure is warranted (*See,* U.S.S.G. 5H1.1), the guidelines have not specifically weighed in on the recent series of Supreme Court cases that discuss the clinical functioning of the juvenile mind. As the Court recognized, the same characteristics that render juveniles less culpable than adults — their immaturity, recklessness, and impetuosity — make them less likely to consider potential punishment. *Graham v. Florida,* 130 S.Ct. 2011, 2028 (2010).

As the Supreme Court noted when discussing juvenile crime:

> "As compared to adults, juveniles have a "'lack of maturity and an underdeveloped sense of responsibility'"; they "are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure"; and their characters are *"*not as well formed. These salient characteristics mean that "[*i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.*" Accordingly, *"juvenile offenders cannot with reliability be classified among the worst offenders. A juvenile is not absolved of responsibility for his actions, but his transgression "is not as morally reprehensible as that of an adult.*" *Graham v. Florida*, 130 S.Ct. at 2022. (Citations omitted, emphases added.)

5

The Supreme Court's adoption of a developmental model of culpability should be considered in all sentencing cases where the defendant is a juvenile, or, in Pamela's case, barely an adult with a childhood of suffering and trauma that surely limited her development into a mature, responsible adult. *See*, e.g., DeBellis, *The Biological Effects of Childhood Trauma,* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3968319/pdf/nihms-555973.pdf ("The data to date strongly suggests that childhood trauma is associated with adverse brain development in multiple brain regions that negatively impact emotional and behavioral regulation, motivation, and cognitive function.") Given her age and the trauma of her upbringing, Pamela actions are "surely not as reprehensible as that of an adult." *See, Graham v. Florida,* 130 S.Ct. 2022.

Finally, with a sentence of imprisonment, Pamela will suffer obvious collateral consequences, perhaps the worst possible collateral consequence imaginable. She will permanently lose custody of her 3 year old son, who she adores beyond words. According to her former CPS attorney, Lisa Friedman, Esq., if Pamela is immediately deported, it is possible that she can be reunited with her son in Honduras, assuming CPS in Honduras believes Pamela's living conditions are safe for a child and Pamela has sufficiently rehabilitated. If she is imprisoned in this case, the State court will terminate her parental rights. There is no recourse for Pamela. Once her son is adopted, she will lose her parental right*s forever*. It is hard to imagine a more cruel, more permanent punishment than taking a 3 year old child from his mother who loves him.[3]

Pamela will be also deported to Honduras and never be allowed to return to the United States, despite the fact that her extended family (and new baby) are in the United States, and her hometown of Tegucigalpa is one of the most dangerous in Honduras. *See, Jordan v. De George*, 341 U.S. 223, 232 (1951)(Jackson, J.) (deportation is "a life sentence of banishment in addition to the punishment which a citizen would suffer from the identical acts.").

---

[3]. In the event the Court wants more information on this devastating collateral consequence, the defense will be happy to provide it. Family Code §7820, *et seq.,* provides for the loss of parental rights, and tight time frames for that decision to be made.

Deportation is a form of banishment, one of the oldest forms of punishment in existence. From the tale of Adam and Eve being thrown out of the Garden of Eden, to a defeated Napolean being sent to the Isle of Elba, banishment has served as powerful deterrent throughout history. "Ostracism" was used by the Ancient Greeks and Romans, where a capital defendant could choose to leave the country forever. Justices in Georgia, Mississipi, Arkansas, Florida and Kentucky still have intra-state exile as sentencing options. Clearly, besides losing her child, deportation should also be considered a serious "collateral consequence", as it is a punishment from which she can never escape.

There are two final considerations of Pamela's character, and they are best viewed through the letters of her friends and family, and through her commitment to improve herself, which the Court can see through her achievements while in custody. These documents are attached as exhibits. Pamela is obviously loved by her family and friends, and she is a loving and caring mother to her son, of which the attached letters speak volumes.

### IV.    Conclusion

In sum, considering the above 3553(a) factors, Pamela Carrero clearly deserves a significant downward variance. The Court should follow the recommendation of the U.S. Probation Department and sentence her to time served.

HALLINAN & WINE

Dated: January 4, 2022

/s/ Kenneth Wine
Kenneth H. Wine
Attorney for Defendant
PAMELA CARRERO

7