STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

SAILAJA M. PAIDIPATY (NYBN 5160007)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    sailaja.paidipaty@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>PAMELA CARRERO,<br>    a/k/a "Nicole,"<br>    a/k/a "Kendra."<br><br>    Defendant. | CASE NO. 20-480-03 WHA<br><br>**UNITED STATES SENTENCING MEMORANDUM**<br><br>Judge: Hon. William Alsup<br>Sentencing Date: January 11, 2022<br>Time: 2:00 p.m. |

## I. INTRODUCTION

Pamela Carrero worked as a dutiful foot solider in the drug trafficking organization (DTO) run by her mother, Leydis Yaneth Cruz, and her brother, Emilson Cruz Mayorquin. On a near daily basis, she, along with other co-conspirators, traveled from the East Bay to the streets of the Tenderloin where she sold drugs, including fentanyl. Between August 2019 and March 2020, officers of the San Francisco Police Department (SFPD) arrested Carrero twice for drug sales in the Tenderloin. Undeterred, Carrero continued trafficking drugs and in July 2020, on Hyde Street, sold a small quantity of fentanyl to an undercover federal agent. Following that initial sale, Carrero went on to sell fentanyl or counterfeit pharmaceutical pills containing fentanyl to the undercover agent on six additional occasions. Each time, Carrrero was able to procure and sell larger quantities of drugs. At the time of her arrest in December

2020, agents seized approximately 1,422.5 gross grams of fentanyl, 153.1 gross grams of cocaine, and 276.5 gross grams of methamphetamine from the apartment that she shared with her mother, her young son, and her niece.

The Presentence Report sheds some light on how Carrero found herself working for the family business. The Report details Carrero's history of harrowing abuse at the hands of her family members. She then came to the United States where her mother and brother sold drugs. Her family's influence over her and the legacy of abuse likely contributed to her joining the drug trade.

At the same time, Carrero's drug contacts through her mother and brother helped her acquire the drugs that she sold, including the larger quantities of drugs that she sold the undercover agent. And even daily sales of small amounts of fentanyl add up to significant amounts of a deadly drug being put into the hands of users.

As calculated by the U.S. Probation Office, Carrero's final offense level, inclusive of safety valve, is a level 21. At a Criminal History Category I, this results in an advisory Guidelines range of 37-46 months. In December 2020, this Court sentenced Carrero's brother, Emilson Cruz Mayorquin, to 51 months in custody. Accounting for Carrero's relative role in the conspiracy, the quantity of drugs that she sold, and the need to avoid unwarranted sentencing disparities, the government recommends the imposition of a 27-month sentence, followed by a mandatory four years of supervised release, a $100 special assessment, and forfeiture.

## II.    PROCEDURAL POSTURE

On December 8, 2020, the Honorable Laurel Beeler, U.S. Magistrate Judge, issued a criminal Complaint charging Carrero and five co-defendants with conspiring to traffic fentanyl in the Bay Area. Dkt. 1. In conjunction with the Complaint, the Court issued warrants authorizing the arrest of Carrero and her co-defendants. *Id.* Two days later on, December 10, 2020, federal agents arrested Carrero and six other individuals (the five co-defendants charged in the Complaint as well as one other individual, Mayer Benegas Medina who was charged the same day in a separate Complaint, *see* 20-mj-71816-MAG). The following week, a federal grand jury returned an Indictment charging Carrero and the six individuals arrested on the day of the takedown. Dkt. 23. Carrero was charged with participating in a conspiracy to traffic fentanyl and with five counts of distribution of fentanyl. *Id.*

On September 7, 2021, Carrero entered a guilty plea to Count Five of the Indictment pursuant to a written agreement with the government.

## III.  SENTENCING GUIDELINES CALCULATION

In paragraph two of the parties executed plea agreement, Carrero admitted distributing at least 160 grams of fentanyl, but not more than 280 grams of fentanyl. The commensurate base offense level under the U.S. Sentencing Guidelines (U.S.S.G.) is a level 26. Paragraph seven of the plea agreement inadvertently incorrectly represented a base offense level associated with that drug quantity as a level 28. The government, defense, and U.S. Probation Office ("Probation") all agree that the base offense level as supported by the recitation of facts in the plea agreement is a level 26.

In addition, Carrero satisfied the statutory requirements of the federal safety valve set forth in 18 U.S.C. § 3553(f). As a result, this Court is not bound by the 60-month mandatory minimum applicable to the statute of conviction. In addition, under U.S.S.G. § 5C1.2, a two-level reduction is applied.

Accordingly, the applicable Guidelines calculation is as follows:

  a.  Base Offense Level (U.S.S.G. §§ 2D1.1(a)(5), (c)(7)):  26
      (At least 160 grams but less than 280 grams of fentanyl)
  b.  Acceptance of Responsibility (U.S.S.G. § 3E1.1(a)):  - 3
  c.  Safety Valve (U.S.S.G. § 5C1.2):  -2
  d.  Final Offense Level  21

The parties and Probation agree that Carrero is a Criminal History Category I, resulting in an advisory Guidelines range of 37-46 months. As noted above, the government seeks the imposition of a 27-month sentence, which constitutes a three-level downward variance from the Guidelines range.

## IV.  GOVERNMENT'S SENTENCING RECOMMENDATION

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The Court should begin by calculating the correct sentencing range under the Sentencing Guidelines. Id. The Guidelines are "the 'starting point and the initial benchmark,'" *United States v. Ellis*, 641 F.3d 411, 415 (9th Cir. 2011) (quoting *United States v. Kimbrough*, 552 U.S. 85, 108 (2007)), and the Court should "remain cognizant of them throughout the sentencing process."

*United States v. Gall*, 552 U.S. 38, 50 n.6 (2007). After determining the appropriate Guidelines calculations, the Court should then evaluate the sentence for substantive reasonableness in light of the factors set out in Section 3553(a). *Carty*, 520 F.3d at 991-93. Here, the most important considerations are the nature and circumstances of the offense, the history and characteristics of the defendant, the need to afford adequate deterrence, and the need to avoid unwarranted sentencing disparities. 18 U.S.C. § 3553(a)(1), (a)(2)(B), (a)(6).

### A. Carrero sold fentanyl in the Tenderloin despite prior arrests for drug trafficking.

There is no question here that Carrero sold a significant quantity of dangerous drugs and did so despite multiple prior arrests in San Francisco. In August 2019, SFPD officers arrested Carrero after seeing her conduct "hand-to-hand" drug transactions near 7th and Stevenson Streets. Presentence Report ("PSR") ¶ 40. Upon searching Carrero, officers seized small quantities of fentanyl, cocaine base, heroin, and methamphetamine, in addition to cash. *Id.* While that state case remained pending, Carrero went back to street-level sales. A little over six months later, Carrero was once more arrested by SFPD near Golden Gate and Hyde Streets, only one block away from the federal courthouse. On that occasion, Carrero appeared to be working with another individual in selling to drug users. SFPD officers saw an individual hand Carrero money. PSR ¶ 41. Carrero then motioned to an associate who brought over what police determined to be baggies of drugs. *Id.*

As a condition of both arrests, Carrero was required to stay away from the Tenderloin. But four months after the second arrest, and while both state cases were pending, Carrero again went back to drug sales. As described in the criminal Complaint, on July 2, 2020, an undercover federal agent ("UC") purchased fentanyl from Carrero on Hyde Street in the Tenderloin. Dkt. 1, Compl. ¶¶ 57-67.

Over the course of the investigation, Carrero sold larger and larger quantities of fentanyl to the undercover. This underscores her access to a drug supply, primarily through her mother. For example, as described in the Complaint, on August 27, 2020, Carrero met with the UC and sold fentanyl. *Id.* ¶ 70-71. During that meeting, the UC asked if Carrero could sell more of the drug. *Id.* ¶ 73. Carrero then called her mother and indicated that the UC wanted to buy more fentanyl. *Id.* Shortly afterwards, Carrero's mother brought another ounce of fentanyl that the two sold to the UC. *Id.* ¶ 74. In total, the two sold 123 net grams of fentanyl that day for $7,800. *Id.* ¶ 74.

On another occasion, Carrero sold one ounce of fentanyl and 1,000 counterfeit pharmaceutical pills containing fentanyl to the UC for $10,000. *Id*. ¶ 77-81. Federal agents across the country have seen an increase in the sale of fentanyl-laced pills. Often referred to as "M-30s" because they typically are etched with the letter M and the number 30, which are the markings on oxycodone tablets, these pills can contain lethal doses of fentanyl. In reaction to the sheer volume of pills seized recently, the Drug Enforcement Administration, in September 2021, issued its first Public Safety Alert in six years to increase awareness of the prevalence of these drugs on the black market.[1] The DEA alert noted that lab analyses revealed that "two out of every five fake pills with fentanyl contain a potentially lethal dose."[2]

Carrero's easy access to fentanyl pills was illustrated during a subsequent sale to the UC. On November 20, 2020, Carrero initially sold 1,000 pills to the UC for $7,000. Compl. ¶¶ 98, 100. The UC asked if Carrero could obtain another 700 pills for sale. *Id*. ¶ 99. Within ten minutes, Carrero was able to call her drug source and arrange for the additional pills to be delivered. *Id*. ¶¶ 101-103. Approximately 45 minutes later, the drugs were delivered to Carrero, which she in turn sold to the UC for another $5,000. *Id*. ¶¶ 104-106.

**B.   The Court should consider Carrero's background and relative culpability in order to avoid unwarranted sentencing disparities.**

As illustrated through the sale described above during which her mother also participated, Carrero's involvement into the drug trade was influenced by her family connections. Her mother (Leydis) and brother (Emilson)[3] were both well-known suppliers of fentanyl and intercepted calls indicate that others in the community reached out to them for resale quantities of drugs. PSR ¶ 19. When Carrero came into the United States, her mother bonded Carrero out of immigration custody. *See* PSR ¶ 50. Carrero stopped making appearances in immigration Court and she and her mother moved to Oakland. *Id*. Subsequently, Leydis's boyfriend, Jairo Rodriguez-Martinez, was arrested and charged

---

[1] Drug Enforcement Administration. "DEA Issues Public Safety Alert on Sharp Increase in Fake Prescription Pills Containing Fentanyl and Meth." September 27, 2021. Available at https://www.dea.gov/press-releases/2021/09/27/dea-issues-public-safety-alert (last accessed January 4, 2022).

[2] *Id.*

[3] Because many of Carrero's co-defendants share similar last names, the government will refer to these individuals by their first names to avoid confusion.

with drug trafficking in this District.  *See* No Cr 19-0707 HSG.  Carrero's uncle, Ivan Mauro Cruz Mayorquin, is another defendant in this case.  In sum, most of Carrero's relatives appear to be involved in drug trafficking.

Prior to entering the family drug business, Carrero experienced serious abuse at the hands of other family members in Honduras.  The PSR details this repeated abuse by numerous individuals.  *See* PSR ¶ 46, 48-49.  While not an excuse for her repeated drug sales, this background helps contextualize Carrero's susceptibility to the influences and pressure of her family.  With respect to the underlying conspiracy here, it also sheds light on her relative role in in the organization.  Carrero was not a leader or manager, but rather a "worker" or "soldier" in the DTO.  This distinguishes her from Emilson and Leydis.  Her family connections, however, also distinguish her from other street-level dealers who did not have access to the larger supplies of drugs that Carrero was able to procure and sell to the UC.  The statutory sentencing factors require this Court to avoid unwarranted sentencing disparities.  18 U.S.C. § 3553(a)(6).  Last month, the Court sentenced Emilson, one of the most culpable individuals in the organization, to 51 imprisonment.  Considering Carrero's role in contrast, the government recommends the imposition of a 27-month sentence.  This three-level downward variance from the advisory Guidelines range accounts for the Carrero's history of abuse, her family influences, the significant quantity of fentanyl that she sold for thousands of dollars, and her relative role in the organization.

A further downward variance is not warranted.  Probation recommends the imposition of a time served sentence.  The time served recommendation may be influenced by the ongoing child custody case currently pending in Alameda county.  Because of the quantity of drugs seized from her apartment at the time of her arrest, Child Protective Services (CPS) took custody of Carrero's then two-year-old son.  *Id.*  During the preparation of the PSR, defense counsel noted that there is a "decent chance" that Carrero could regain custody of her son if this Court does not impose a longer custodial sentence.  *Id.*  The government does not diminish the import of this tragic situation.  However, the decision regarding custodial rights is subject to a separate judicial process with its own legal standards and considerations.  In making its sentencing recommendation here, the government does not seek to influence that separate proceeding one way or another and defers to the state process.  While the government recognizes the mitigating circumstances in this case and has taken those circumstances into account in its

recommendation, a time served sentence is inappropriate given the quantity and lethality of the drugs sold and the repeated nature of Carrero's conduct.

## V. CONCLUSION

The United States respectfully requests that this Court impose a sentence of 27 months' imprisonment, followed by four years of supervised release, a mandatory $100 special assessment, and forfeiture of the electronic devices identified in the plea agreement.

DATED:                                                                 Respectfully submitted,

STEPHANIE M. HINDS
United States Attorney


_____/s_____
SAILAJA M. PAIDIPATY
Assistant United States Attorney